**2020 WI App 21**

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

| | |
|---|---|
| Case Nos.: | 2018AP1268-CR, 2018AP1269-CR |

†Petition for Review filed

Complete Title of Case:



**STATE OF WISCONSIN,**

  **PLAINTIFF-RESPONDENT,**

  **V.**

**RONALD EUGENE PROVOST,**

  **†DEFENDANT-APPELLANT.**


| | |
|---|---|
| Opinion Filed: | April 14, 2020 |
| Submitted on Briefs: | October 8, 2019 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
|    Concurred: | |
|    Dissented: | |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher M. Zachar* of *Zachar Law Office, LLC*, La Crosse. |
| Respondent<br>ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Michael C. Sander*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

**2020 WI App 21**

**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**April 14, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2018AP1268-CR**
**2018AP1269-CR**

Cir. Ct. Nos. 2014CF390
2015CF143

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

RONALD EUGENE PROVOST,

    DEFENDANT-APPELLANT.

APPEALS from judgments and orders of the circuit court for Douglas County: GEORGE L. GLONEK, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1 SEIDL, J. In these consolidated appeals, Ronald Provost appeals a judgment, entered upon a jury's verdict, convicting him of causing a child to view sexual activity and a judgment, entered upon his guilty pleas, convicting him of

seventh-offense operating a motor vehicle while intoxicated (OWI) and felony bail jumping.[1] He also appeals the orders denying his motions for postconviction relief.

¶2      With respect to his conviction for causing a child to view sexual activity, Provost contends that he was denied his constitutional right to a speedy trial under the traditional four-factor test established in *Barker v. Wingo*, 407 U.S. 514 (1972), as applied and interpreted by our case law. In the alternative, he argues that because two of the attorneys appointed to represent him failed to adhere to the minimum performance guidelines set by the Office of the Wisconsin State Public Defender (SPD), we should adopt and apply the "systemic breakdown" exception established by *Vermont v. Brillon*, 556 U.S. 81 (2009), to conclude that his speedy-trial right was violated.[2]

¶3      As to his conviction for seventh-offense OWI, Provost contends that his trial counsel provided him with ineffective assistance. Specifically, he faults his counsel for failing to collaterally attack two of his prior OWI-related criminal convictions in Minnesota.

¶4      We conclude that: (1) considering the four *Barker* factors in light of the totality of the circumstances, there was no violation of Provost's right to a speedy trial; (2) even assuming that two of the attorneys assigned to represent Provost failed to adhere to the minimum standards set by the SPD (an assumption

---

[1] In regard to the latter judgment, Provost only raises an argument concerning the seventh-offense OWI conviction. Consequently, we deem any challenge to his felony bail jumping conviction abandoned. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (arguments not pursued on appeal may be deemed abandoned).

[2] The "systemic breakdown" exception allows for a delay caused by a defendant's assigned counsel—which is normally attributable to a defendant—to be imputed to the State. *See Vermont v. Brillon*, 556 U.S. 81, 94 (2009).

2

which, for reasons explained below, is generous), no "systemic breakdown" occurred within the meaning of ***Brillon***; and (3) Provost has failed to demonstrate that he was prejudiced by his counsel's failure to collaterally attack the challenged prior OWI convictions. Consequently, we affirm.

## BACKGROUND

¶5  On August 14, 2014, the State filed a criminal complaint against Provost in Douglas County case No. 2014CF300. After the State failed to timely arraign Provost, however, the charges against Provost were dismissed without prejudice. The State then filed a criminal complaint against Provost in Douglas County case No. 2014CF390. The charges against Provost in case No. 2014CF390—one count each of causing a child to view sexual activity and child enticement—were the same as those previously brought in case No. 2014CF300 and were based upon the same conduct.[3]

¶6  More specifically, the State alleged in the criminal complaint that Provost answered an online advertisement purporting to be from a "younger" female

---

[3]  We note that the date on which, and the case number under which, Provost was originally charged are taken from assertions in the "statement of the cases and facts" section of Provost's brief-in-chief. The record citation Provost provides to support these assertions is a transcript from Provost's initial appearance in Douglas County case No. 2014CF390, in which the circuit court observes that the "same charges" had been previously dismissed without prejudice due to the State's failure to timely arraign Provost. The court did not, however, state either the date on which, or the case number under which, the charges had been previously filed. Nor has our independent review of the record confirmed either of Provost's assertions, and no record of any case having been filed against Provost in August 2014 appears on the Consolidated Court Automation Programs (CCAP) website.

Nonetheless, we accept as fact that the charges against Provost—which eventually led to his conviction in case No. 2014CF390—were originally filed on August 14, 2014, as case No. 2014CF300. We do so for two reasons: (1) the State does not dispute Provost's assertions in its response brief; and (2) the State agrees with Provost that it took nearly thirty-five months from the date charges were brought against him to the date of his trial in case No. 2014CF390—a calculation that is accurate only if the charges were, in fact, originally filed in August 2014.

3

"looking 4 someone to have fun with" by asking if the advertisement's poster would "like to have lots of fun, like to be eaten out?" The poster, who was actually an investigator from the City of Superior Police Department, responded that "I am only 15." A text conversation ensued, during which Provost sent the purported fifteen-year-old female a picture of his erect penis and arranged to meet at a hotel for a sexual encounter. When Provost arrived at the hotel, police placed him under arrest.

¶7     Provost was arraigned in case No. 2014CF390 on December 15, 2014. The circuit court, at the request of Provost's appointed counsel, Fredric Anderson, did not set a trial date at the arraignment. Instead, the court scheduled a status conference for February 2, 2015, to accommodate Anderson's request to allow for further "discussions" with the State.

¶8     The case proceeded through a series of status conferences over the next twenty months.[4] These conferences were scheduled at the request of attorney Anderson for various reasons, including twice due to the filing of new felony charges against Provost in separate, unrelated cases. As relevant to this appeal, in one of those cases, Douglas County case No. 2015CF143, the State charged Provost with seventh-offense OWI and two counts of felony bail jumping.

¶9     On June 6, 2016, the circuit court scheduled a trial for all of the pending cases against Provost for September 29, 2016, with a mandatory pretrial conference on September 16. Provost, however, failed to appear at the pretrial conference. Consequently, the court issued a bench warrant and removed the trial

---

[4] As will be seen below, Provost did not make a speedy trial demand during this time period.

date from the court's calendar. Provost was taken into custody one month later, on October 25, and the court imposed a $25,000 cash bail as a condition for his release.[5] The court also rescheduled Provost's trial date for January 26, 2017.

¶10    On November 15, 2016—more than two years after the charges against him were filed—Provost filed a demand for a speedy trial. Six days later, attorney Anderson moved to withdraw as counsel. Anderson asserted two reasons for his request: (1) he had "developed a conflict of interest"; and (2) his relationship with Provost had "deteriorated." The court granted Anderson's motion on the same day it was filed.

¶11    The next day, the SPD appointed attorney Christopher Gramstrup to represent Provost in all the cases currently pending against him in Douglas County, including case Nos. 2014CF390 and 2015CF143. At a pretrial hearing on January 9, 2017, Gramstrup informed the circuit court that a plea agreement had been reached in case No. 2015CF143, although no such agreement had been reached in case No. 2014CF390.[6] On January 19, 2017, in accordance with the plea agreement, Provost entered guilty pleas to seventh-offense OWI and one count of felony bail jumping in case No. 2015CF143. The court revoked Provost's bond at the conclusion of this plea hearing.

¶12    At the outset of the February 15, 2017 sentencing hearing in case No. 2015CF143, the State informed the circuit court the parties had reached a plea agreement to "resolve all the files." Consequently, the court decided to take

_____

[5] Due to his inability to post this bail, Provost remained in custody.

[6] According to the transcript for this pretrial hearing, at this time the trial date for case No. 2014CF390 had been rescheduled to February 16, 2017, although the appellate record is unclear as to when this rescheduling occurred.

5

Provost's plea in case No. 2014CF390 before proceeding to sentencing in case No. 2015CF143. During the plea colloquy, however, Provost stated he "was having trouble with this case, Your Honor, because I didn't have nothing to do with any kid or anything, but yet I'm told I'm going to be crazy if I don't take this plea." Based on this statement, the court concluded that Provost's plea was not "freely and voluntarily made," and it declined to accept it.

¶13    Due to the unresolved status of case No. 2014CF390, the circuit court adjourned the February 15, 2017 hearing without sentencing Provost in case No. 2015CF143. Additionally, the court asked the parties if they had any objections to rescheduling the trial in case No. 2014CF390, which was still on the court's schedule for the next day. Attorney Gramstrup responded: "No. I've talked to my client about that. I don't believe there's an objection." While the parties discussed potential dates for rescheduling the trial, Gramstrup informed the court that Provost had just told him "that he did file a Speedy [trial demand]. However, when I got Mr. Anderson's file, there was no Speedy Trial Demand in there." After the circuit court clerk confirmed that such a demand had been filed, the parties agreed to set the trial for April 25, 2017.

¶14    The following day, at Provost's request, attorney Gramstrup moved to withdraw. The circuit court granted this motion five days later, on February 21, 2017. The next day, the SPD appointed attorney Lance Nelsen to represent Provost.

¶15    Just over one month later, attorney Nelsen moved to withdraw. As with attorney Gramstrup, Nelsen did so at Provost's request. Provost explained at a March 31, 2017 hearing on this motion that he felt that "both [of my] last two attorneys never asked me anything about my case, and they both said, there's nothing I can do for you. And told me I was crazy if I don't take the State's offer.

And I don't feel they were properly representing me." Over the State's objection that allowing Nelsen to withdraw would further delay bringing the case to trial, the circuit court granted Nelsen's motion. The court informed Provost, however, that "at some point we are not going to just keep continuing this case and appointing you new counsel."

¶16 The SPD subsequently appointed attorney Frederick Bourg to represent Provost on April 4, 2017. Bourg then moved the circuit court to release Provost from custody due to an alleged violation of Provost's right to a speedy trial. The court denied this motion, concluding that the delays in bringing Provost to trial had "been to accommodate Mr. Provost in his continual request for different counsel."

¶17 The trial in case No. 2014CF390 ultimately took place on June 29, 2017, with attorney Bourg representing Provost. The jury convicted Provost of causing a child to view sexual activity, but it acquitted him of child enticement.

¶18 Following sentencing in case Nos. 2014CF390 and 2015CF143, Provost filed separate postconviction motions in each case. In case No. 2014CF390, he moved the circuit court to vacate his conviction and dismiss the charges against him based on the alleged violation of his constitutional right to a speedy trial. In case No. 2015CF143, he sought relief based on attorney Gramstrup's alleged ineffective assistance—namely, Gramstrup's failure to collaterally attack two of Provost's prior OWI-related convictions, from Minnesota in 1992 and 2000, on the ground that Provost did not receive the assistance of counsel—nor did he knowingly, voluntarily and intelligently waive that right—during the criminal proceedings in those cases.

7

¶19    The circuit court held a combined evidentiary hearing on Provost's motions. At the hearing, attorney Gramstrup testified he was aware that Provost had not been represented by counsel during the proceedings related to the two challenged Minnesota convictions. Gramstrup also stated that he "believe[d]" he had discussed potentially collaterally attacking those convictions with Provost, although he ultimately did not pursue any collateral attack.

¶20    Provost testified that attorney Gramstrup did not inform him that he could have collaterally attacked any of his prior OWI-related convictions. He also testified that Gramstrup told him he would be "crazy" not to accept a plea agreement in case No. 2014CF390. Similarly, Provost testified that attorney Nelsen "laugh[ed]" at him and told him that there was "nothing [he could] really do for" Provost.[7]

¶21    Provost also testified that on August 2, 2015, a potentially exculpatory witness in case No. 2014CF390 passed away in a motorcycle accident. Provost explained that this potential witness was a longtime friend who was traveling with Provost when he answered the online advertisement. According to Provost, this friend would have testified that Provost expressed skepticism as to whether the person who posted the advertisement was actually fifteen years old.

¶22    The State submitted into evidence a certified copy of Provost's Minnesota driving record. That record showed that, in connection with both the 1992 and 2000 Minnesota criminal cases, Provost had implied consent violations and his driver's license had been administratively revoked.

---

[7] Attorneys Nelsen, Anderson, and Bourg did not testify at the postconviction hearing.

8

¶23 Following arguments from both sides, the circuit court denied Provost's motions. The court first found that attorney Gramstrup's testimony was credible, but that "much of [Provost's] testimony lacks credibility." The court then found that in relation to case No. 2014CF390, "the reasons for the delays all go back to the defendant," and it therefore determined that no speedy trial violation occurred.

¶24 As to case No. 2015CF143, the circuit court concluded that Provost could not show that any deficient performance by attorney Gramstrup prejudiced him. The court reasoned that Provost's Minnesota driving record showed that his driver's license had been administratively revoked in the civil proceedings related to the incidents that led to Provost's convictions in both the 1992 and 2000 criminal cases.[8] Thus, even if Provost's 1992 and 2000 criminal convictions were successfully collaterally attacked due to a violation of Provost's constitutional right to counsel, Provost would still have six countable prior OWI offenses.[9] Provost now appeals.

## DISCUSSION

### I. Case No. 2014CF390

¶25 Provost argues his conviction in case No. 2014CF390 must be reversed because he was denied his constitutional right to a speedy trial. "Both the

---

[8] No Sixth Amendment right to counsel attaches to implied consent proceedings in Minnesota because they are civil in nature. *See Maietta v. Commissioner of Pub. Safety*, 663 N.W.2d 595, 600 (Minn. Ct. App. 2003).

[9] Under Wisconsin's statutory progressive penalty requirement for OWI-related events, "suspensions, revocations, or convictions arising out of the same occurrence or incident shall be counted as one." *See, e.g.*, WIS. STAT. § 346.65(2)(am)6. (2017-18).

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

9

Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution guarantee an accused the right to a speedy trial." ***State v. Urdahl***, 2005 WI App 191, ¶11, 286 Wis. 2d 476, 704 N.W.2d 324. Whether this right has been violated is a question of law that we review independently, although we accept any findings of fact made by the circuit court unless they are clearly erroneous. ***Id.***, ¶10.

¶26 When assessing whether a speedy trial violation has occurred, we apply the four-factor test established in ***Barker***. *See **Urdahl***, 286 Wis. 2d 476, ¶11. That is, we consider: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted the right to a speedy trial; and (4) whether the delay prejudiced the defendant. ***Id.*** This test "weighs the conduct of the prosecution and the defense and balances the right to bring the defendant to justice against the defendant's right to have that done speedily." ***Id.*** Thus, the test requires us to consider the totality of circumstances that exist in each specific case to determine if a speedy trial violation has occurred. ***Id.*** Doing so here, we conclude there was no violation of Provost's right to a speedy trial.

*A. The first **Barker** factor*

¶27 The first ***Barker*** factor—the length of the delay—is a "triggering mechanism used to determine whether the delay is presumptively prejudicial." ***Urdahl***, 286 Wis. 2d 476, ¶12. A postaccusation delay is considered to be presumptively prejudicial when it "approach[es] one year." ***Id.*** It is only necessary to inquire into the other ***Barker*** factors when a delay is presumptively prejudicial. ***State v. Borhegyi***, 222 Wis. 2d 506, 510, 588 N.W.2d 89 (Ct. App. 1998). In this case, the State concedes that the delay of over thirty-four months between the initial filing of charges against Provost on August 14, 2014, and the commencement of his

10

trial on June 29, 2017, was presumptively prejudicial. We therefore consider the remaining ***Barker*** factors.

### B. The second ***Barker*** factor

¶28    The second ***Barker*** factor directs us to consider the reasons for the delay. *See **Urdahl***, 286 Wis. 2d 476, ¶11. In doing so, we first "identify the reason for each particular portion of the delay," and we then "accord different treatment to each category of reasons." ***Id.***, ¶26.

> A deliberate attempt by the government to delay the trial in order to hamper the defense is weighted heavily against the State, while delays caused by the government's negligence or overcrowded courts, though still counted, are weighted less heavily. On the other hand, if the delay is caused by something intrinsic to the case, such as witness unavailability, that time period is not counted. Finally, if the delay is caused by the defendant, it is not counted.

***Id.*** (citations omitted).

¶29    We begin by noting that the circuit court made a factual finding that the entirety of the delay in bringing Provost to trial occurred "to accommodate Mr. Provost and the defense." Provost does not directly challenge this finding on appeal. Instead he argues, for two reasons, that notwithstanding the fact that the delays were made to accommodate him, we should hold the State accountable for not bringing him to trial more quickly. We address, and reject, each of Provost's arguments in turn.

### 1. State's duty to bring Provost to trial

¶30    First, Provost relies on the long-recognized principle that "a defendant has no duty to bring himself to trial; the State has that duty as well as the duty of

11

insuring that the trial is consistent with due process." ***Hadley v. State***, 66 Wis. 2d 350, 361, 225 N.W.2d 461 (1975). Based on this principle, Provost faults the State for permitting the delay in bringing him to trial to occur, because "it is hard to see what more [he] could have done," as "he tried to enforce his constitutional right [to a speedy trial] via written request, verbal demand, and motion to compel, all without success."

¶31     Provost's argument is both factually and legally flawed. Factually, Provost ignores that he did not make a speedy trial demand until November 15, 2016—that is, over two years after the State initially charged him and after his original trial date had to be rescheduled because Provost failed to appear at the pretrial conference. As such, we disagree with Provost that it is "hard to see" what more Provost could have done to bring about a speedier trial. He could have simply: (1) appeared at the mandatory pretrial conference; or (2) promptly demanded a speedy trial when the State filed the charges against him.

¶32     As to his legal argument, Provost seizes on the ***Hadley*** court's statement that "[a] defendant has no duty to bring himself to trial; the State has that duty," while ignoring the court's qualification of the State's duty—i.e., that a State must also "insur[e] that the trial is consistent with due process." *See **id.*** For the reasons explained below, we conclude that Provost's limited reading of ***Hadley*** would render analysis of the second ***Barker*** factor unnecessary, and we therefore reject it.

¶33     If we looked solely at the State's duty to bring a defendant to trial and ignored the State's duty to ensure that the trial is consistent with due process, there would be no need to "identify the reason for each particular portion of the delay" and then "accord different treatment to each category of reasons." *See **Urdahl***, 286

Wis. 2d 476, ¶26. Instead, we would simply calculate the length of the delay and, if it exceeded a certain length, conclude that the right to a speedy trial had been violated.

¶34 The facts of this case demonstrate why we cannot focus exclusively on the State's duty to bring a defendant to trial. As the circuit court found, the delay between the initial charging and Provost's original trial date resulted from "specific requests for delays and rescheduling and continuances" made by attorney Anderson. If we adopted Provost's argument, the State would have been placed on the horns of a dilemma when Anderson made these "specific requests": Object and risk violating Provost's right to due process, or acquiesce and risk violating his right to a speedy trial. Indeed, the *Barker* court itself rejected such a perverse rule, stating: "[B]arring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied th[e] constitutional right [to a speedy trial] on a record that strongly indicates … that the defendant did not want a speedy trial." *Barker*, 407 U.S. at 536.

### 2. Systemic breakdown

¶35 Provost next argues that attorneys Gramstrup and Nelsen failed to adhere to the "minimum performance guidelines" set by the SPD, and that we should therefore adopt and apply the *Brillon* "systemic breakdown" exception. We are not persuaded.

¶36 As an initial matter, we observe that the foundation upon which Provost builds his "systemic breakdown" argument is shaky, at best. Provost relies on his own testimony from the postconviction hearing to assert that, as a matter of fact, both attorneys Gramstrup and Nelsen "ignored his upcoming trial and rarely

13

communicated with Mr. Provost to prepare. They pressured Mr. Provost to plead guilty, told him there was nothing to be done, and laughed at his claims of innocence."

¶37 In making these assertions, Provost notes that his testimony was presented "without rebuttal." He fails to recognize, however, that when a circuit court acts as a finder of fact, it can properly reject even uncontroverted testimony. ***State v. Kimbrough***, 2001 WI App 138, ¶29, 246 Wis. 2d 648, 630 N.W.2d 752. The court may do so because the finder of fact is the ultimate arbiter of the witnesses' credibility and of the weight to be given to their testimony. ***State v. Peppertree Resort Villas, Inc.***, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345. Provost's failure to recognize this principle is notable because, here, the court expressly found that "much of [Provost's] testimony lacks credibility."

¶38 Nonetheless, we recognize that the circuit court did not directly accept or reject that portion of Provost's testimony where he described the manner in which attorneys Gramstrup and Nelsen represented him. Accordingly, we will assume, for the sake of argument, that the court accepted Provost's testimony regarding that representation. Even doing so, we reject Provost's "systemic breakdown" argument.

¶39 There is no dispute that, generally, "delays caused by defense counsel are properly attributed to the defendant." ***Brillon***, 556 U.S. at 94. As the ***Brillon*** Court recognized, this general rule applies even when assigned counsel "fail[s] 'to move [a] case forward,'" and a defendant therefore has a reasonable basis to seek new counsel. *See id.* at 92-93 (citation omitted). The ***Brillon*** Court did, however, carve out a limited exception to the general rule—that is, that "[d]elay resulting from

14

a systemic breakdown in the public defender system could be charged to the State." *Id.* at 94.

¶40     Here, Provost argues the "systemic breakdown" exception applies because attorneys "Gramstrup and Nelsen failed to comply with minimal standards of representation implemented by the State Public Defender's Office."   Before considering Provost's argument, we pause to recognize that the ***Brillon*** Court did not provide precise contours to define what constitutes a "systemic breakdown." *See id.*   Nor has any published Wisconsin case done so.   In considering this issue, however, we find persuasive the decision of the New Mexico Supreme Court in ***State v. Ochoa***, 406 P.3d 505 (N.M. 2017).   Specifically, the ***Ochoa*** court held that a defendant must show "problems that are both institutional in origin and debilitating in scope" to establish that a "systemic breakdown" occurred within the meaning of ***Brillon***.[10]   ***Ochoa***, 406 P.3d at 514.

¶41     Applying this common-sense definition, we conclude that no systemic breakdown occurred in this case.   At most, Provost has identified that two of the attorneys appointed to represent him (for a combined total of 125 days) failed to comply with performance standards promulgated by the SPD.   But the failure of two individual attorneys to meet the standards set by the SPD does not show a problem that is institutional in origin or debilitating in scope—especially where, as here,

---

[10] We note that in defining what constitutes a "systemic breakdown," the ***Ochoa*** court observed that its interpretation was consistent with the other jurisdictions that have considered the issue. *See **State v. Ochoa***, 406 P.3d 505, 514 (N.M. 2017) (collecting cases).   Outside of his misplaced reliance on an earlier New Mexico Supreme Court decision—which we discuss below— Provost provides no citation to any legal authority that causes us to doubt the appropriateness of the ***Ochoa*** court's "systemic breakdown" definition.

Provost presented no evidence that the individual attorneys' alleged failures resulted from a lack of funding, training or supervision in the SPD system.

¶42     In short, without showing that there is a problem whose origin lies with the SPD system itself, Provost cannot show that a systemic breakdown occurred.  Consequently, the "systemic breakdown" exception to the general rule that we attribute delays caused by defense counsel to the defendant does not apply.

¶43     Provost relies upon *State v. Serros*, 366 P.3d 1121 (N.M. 2015), to support his "systemic breakdown" argument.  Provost's reliance on that decision is fundamentally misplaced, however, as the *Serros* court did not even mention *Brillon*'s "systemic breakdown" exception.  *See Serros*, 366 P.3d 1121.  Instead, the *Serros* court considered if *Brillon*'s discussion of whether defense counsel acts as an agent of the State (in certain circumstances not at issue here), had undermined a prior decision of the New Mexico Court of Appeals.  *See id.* at 1134.  Because the *Serros* court did not even mention the "systemic breakdown" exception—and because the same court which issued *Serros* actually did address that exception two years later in *Ochoa*—we will not further discuss Provost's misplaced reliance on the *Serros* decision.

¶44     In sum, we uphold the circuit court's finding of fact that the entirety of the delay in bringing Provost to trial occurred "to accommodate Mr. Provost and the defense."  Because we reject Provost's arguments that we should nevertheless attribute the delay in bringing him to trial to the State, we conclude that the reasons for the delay weigh against a conclusion that Provost's right to a speedy trial was violated.  *See Urdahl*, 286 Wis. 2d 476, ¶26.

### C. The third *Barker* factor

¶45     The third *Barker* factor directs us to consider whether the defendant asserted his or her right to a speedy trial.  *See Urdahl*, 286 Wis. 2d 476, ¶11.  As referenced above, Provost places much emphasis on the fact that he "explicitly demanded a speedy trial."  He fails, however, to reconcile that assertion with the fact that his demand was made after he himself caused his first trial date to be removed from the court's calendar by missing his mandatory pretrial conference.  "Though a defendant's failure to demand a speedy trial will not constitute a waiver of the right, the defendant's complete failure or delay in demanding a speedy trial will be weighed against him."  *Hatcher v. State*, 83 Wis. 2d 559, 568, 266 N.W.2d 320 (1978).  Moreover, as the State aptly notes, once Provost actually did file his speedy trial demand—over two years after the case was originally filed—the State brought him to trial in less than eight months.  Consequently, we conclude that this factor does not weigh in favor of Provost's claim that he was deprived of his right to a speedy trial.

### D.  The fourth *Barker* factor

¶46     Finally, the fourth *Barker* factor directs us to consider whether Provost was prejudiced by the delay in bringing him to trial.  *See Urdahl*, 286 Wis. 2d 476, ¶11.  When assessing this factor, we consider "the three interests that the right to a speedy trial protects:  prevention of oppressive pretrial incarceration, prevention of anxiety and concern by the accused, and prevention of impairment of defense."  *Id.*, ¶34.  Provost argues that each of these interests weigh in favor of his claim that he was denied the right to a speedy trial.  We address, and reject, each of his arguments in turn.

¶47     First, Provost asserts his defense was impaired in that an "exculpatory witness died" during the delay, which he contends is a "crucial factor" that we "must

17

weigh" in his favor. We acknowledge that the death of an exculpatory witness during a delay in bringing the defendant to trial generally weighs in favor of finding that the defendant was prejudiced by the delay. *See **Barker***, 407 U.S. at 532. But here, we agree with the State that the death of Provost's acquaintance does not weigh heavily, if at all, in favor of finding that the delay prejudiced Provost's ability to present a defense.

¶48 This conclusion follows because the unexpected death of Provost's friend occurred less than one year after Provost was initially charged. The delay therefore had not even reached the presumptively prejudicial stage at the time the witness became unavailable, so we can hardly say that it was the delay which caused the witness's unavailability—rather, it was an unforeseen motorcycle accident. Moreover, even if the delay did minimally contribute to the witness's unavailability, the fact that the delay was solely attributable to attorney Anderson's requests for continuances counsels against assigning much weight to any resulting prejudice.

¶49 Second, Provost argues that the delay in bringing him to trial resulted in oppressive pretrial incarceration (i.e., the eight months he spent in jail from his October 25, 2016 arrest until the June 29, 2017 trial). We are not persuaded. Once again, Provost ignores the fact that it was not the State's delay that led to the condition of which he complains; it was his own failure to appear at the mandatory pretrial conference. If he had so appeared, the circuit court would not have issued a bench warrant for his arrest, and he would not have had a cash bond imposed. Further, Provost fails to recognize that when he pled guilty to the seventh-offense OWI and felony bail jumping counts in case No. 2015CF143 on January 19, 2017, the court immediately revoked his bond in that case. Thus, any delay in case No. 2014CF390 from that point forward did not cause Provost to be incarcerated

18

pretrial because Provost would have remained incarcerated regardless of the status of the proceedings in case No. 2014CF390. As such, we cannot conclude that the delay in bringing Provost to trial caused him to suffer prejudice from "oppressive" pretrial incarceration.

¶50 Finally, Provost asserts that the delay caused him to lose his apartment, his job, his relationship with his children, weight, sleep, and the opportunity to pursue college programming. More specifically, he asserts that he suffered this "substantial stress" during the eight months that he was incarcerated. But, as just explained, that period of incarceration was attributable to Provost's own actions, not to any delay caused by the State. We therefore attribute little weight to this interest.

¶51 Ultimately, although the length of the delay in this case was presumptively prejudicial under the first *Barker* factor, we conclude that the three remaining factors do not support Provost's argument that he was deprived of his constitutional right to a speedy trial. We therefore decline to reverse Provost's conviction in case No. 2014CF390.

## II. Case No. 2015CF143

¶52 Provost argues his conviction in case No. 2015CF143 must be reversed because attorney Gramstrup provided him with ineffective assistance by failing to collaterally attack his 1992 and 2000 OWI-related Minnesota criminal convictions. Whether an attorney rendered ineffective assistance is a mixed question of fact and law. *State v. Nielsen*, 2001 WI App 192, ¶14, 247 Wis. 2d 466, 634 N.W.2d 325. We will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* However, whether a defendant's proof is sufficient to

establish ineffective assistance is a question of law that we review independently. *Id.*

¶53    To prevail on an ineffective assistance claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697. In this case, we need not address the first prong because, even assuming attorney Gramstrup performed deficiently, we conclude Provost has failed to establish prejudice.

¶54    To demonstrate prejudice, a defendant must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The *Strickland* prejudice test is "distinct from a sufficiency of the evidence test," and a defendant "need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89.

¶55    Here, we conclude Provost has not met his burden to show that there is a reasonable probability that the result of his plea hearing would have been different had attorney Gramstrup collaterally attacked his 1992 and 2000 criminal convictions. This conclusion is compelled by the fact that the State introduced evidence of Provost's certified driving record at the postconviction hearing, which the circuit court found showed that the incidents that led to Provost's convictions in both the 1992 and 2000 cases also resulted in Provost's driver's license being administratively revoked.

¶56    As a matter of law, those two administrative revocations were independently countable prior offenses under Wisconsin's statutory progressive penalty requirement for OWI-related events—even though the conviction and the revocation arising out of the same incident, taken together, could only be considered one countable prior offense.  *See* WIS. STAT. § 346.65(2)(am)6.; *see also* ***City of Cedarburg v. Hansen***, 2020 WI 11, ¶16, 390 Wis. 2d 109, 938 N.W.2d 463. Consequently, even if attorney Gramstrup had successfully collaterally attacked Provost's 1992 and 2000 criminal convictions, Provost would still have been properly charged and convicted with seventh-offense OWI in case No. 2015CF143.

¶57    On appeal, Provost argues that the evidence of the administrative revocations was "not subjected to the adversarial process" and that we should "remand for an evidentiary hearing to determine whether the alleged Minnesota administrative suspensions are independently countable."  In so arguing, Provost misunderstands the nature of a postconviction claim of ineffective assistance of counsel.

¶58    To explain, Provost relies on ***State v. Carter***, 2010 WI 132, ¶27, 330 Wis. 2d 1, 794 N.W.2d 213, to assert that the "State bears the burden of proof" to show that the administrative revocations are independently countable.  Based on this premise, he faults the State for not sufficiently introducing proof that the administrative revocations were, in fact, "independently countable"—although he agrees that the State could rely on those revocations to establish he had six countable offenses "[i]f the record were clearer."

¶59    Provost is correct that the ***Carter*** court held that the State bears the burden, at sentencing, to show that prior OWI-related out-of-state administrative revocations are countable offenses.  *See **id.**,* ¶¶25-27.  But Provost brought his

21

challenge to the amount of his prior countable offenses after sentencing, premised on the argument that even though his record undisputedly showed six prior criminal convictions, two of those criminal convictions could have been successfully collaterally attacked and therefore should not have been counted.

¶60    Under the well-established *Strickland* framework, Provost bore the burden at his postconviction hearing to show that the result of the proceeding against him would have been different had attorney Gramstrup actually, and successfully, collaterally attacked those convictions.  By failing to show that the administrative revocations, which arose out of the same incidents which led to the 1992 and 2000 criminal convictions were not independently countable, he failed to meet this burden.  Accordingly, based on Provost's own failure to make the "record … clearer," we cannot conclude that Gramstrup provided him with ineffective assistance.

*By the Court.*—Judgments and orders affirmed.

22